I'd like to reserve five minutes for rebuttal, if that's okay. May it please the Court? My name is Laura Franz, and I represent AMC Entertainment. This case presents issues of fair notice and equity, as well as respect for the federal court hierarchy. The Court below erred in approving an order sought by the Department of Justice without sufficient consideration or sensitivities to the equities mitigating against retroactive enforcement of a post-construction interpretation of a regulation that is, at best, profoundly ambiguous. And what makes this situation more extreme is that it happens against the backdrop of deep and express congressional concern that builders have advanced notice about what is required under Title III of the ADA involving places of public accommodation. The Court below also erred in allowing the Department of Justice to engage in non-acquiescence by issuing or suggesting the issuance of an order to include theaters within the Fifth Circuit Court of Appeals, where that Court had already spoken authoritatively about and inconsistently with the Ninth Circuit about the issue at bar here. I'd like to focus my oral argument on the fair notice issues, the comedy and hierarchy of federal courts issues, and fairness and enforcement in general. As a background, traditionally movie theaters had to develop lines of sight based upon staggered seating and sloped floors, floors that sloped back from the screen, in a way that was not very happy results for the general public, because in most cases, the seats were not ideal, and even where a seat was acceptable to a person, the line of sight was often lost if somebody that was taller would happen to sit in front of that individual. There used to be advertisements saying, ladies, please remove your hats. Right, exactly. You can't remove somebody's head, and what happened in a lot of cases was there was no clear line of sight. The access regulations required that wheelchair seats be placed on a flat surface with accessible egress for safety purposes. They also required that there be comparable lines of sight, and there was a provision in 4.33.3, which is the regulatory code that's at issue here, that said that where there was more than 300 seats in a theater, that there would have to be more than one location, and that was generally known as dispersal. Ms. France, as I understand the argument, it is that the government has interpreted the regulations, the same regulations, one way at one time, and then all of a sudden they decided to interpret them a different way, even though they're the same regulations. Would that not be the argument? Right, Your Honor. And if that is your argument, I guess my biggest problem about the fair notice issue is that this court has some prior precedent, which is right on point, and that is the Paralyzed Veterans case, or Stumann's v. Regal Sinema's case, said that we were going to enforce in the Ninth Circuit these regulations and didn't have much to say about fair notice. In fact, all of the Sinemas in that case were subjected to the same regulations, whether they had had fair notice or not. The fair notice argument, if it was raised, it was not even an issue, really, to the court, because the court said the government has a right to interpret these regulations, the government did interpret these regulations, and everybody will have this. And therefore, if in fact there was a problem, it was all applied retroactively as well as prospectively after the Paralyzed Veterans case. There's been nothing in Regal Sinema's case which would say, well, you don't have to do it only in the prospective, but they had to do it wherever it was, whenever it was, and it was applied. And now you're asking me in this case to say that there's a difference, I should only do it prospectively after a certain period of time. We didn't do that in our precedent. How do I do that in this case? Your Honor, first of all, the Paralyzed Veterans case, also known as Stumann v. Regal, because the names changed on appeal, did not deal with remedies at all. The court said that the question before it was whether the Department of Justice's interpretation was reasonable, and the court said, yes, it was. Therefore, the court deferred to the interpretation under prior precedent. The court did not say that it was the only reasonable interpretation. It did not even say that the Department's interpretation jumped off the page. I wasn't certain if Your Honor was referring to another Paralyzed Veterans case in Bowling Stadium. No. Okay. I wasn't referring to that case. I mean, if I apply that case in Regal Sinema's, and I'm going to call it that simply because I don't know whether to call it Paralyzed Veterans or Stumann, if I apply that rationale, when that went back there, every Sinema had to do what they had to do, regardless of when it was they had placed their particular chairs or their particular situation. There was nothing in there that said, oh, well, you've got to just look at this after a certain period of time, oh, well, you can't do it this way, just right through. And that's my precedent that I have to apply. Now, I may not agree with it. I may think, boy, that doesn't seem fair. But given the application, I don't know how I can come out any differently. Indeed, Your Honor. On Regal's petition for certiorari in that case, the Department of Justice took the position that the issue of fair notice and appropriate equity remedy has not yet been decided in this case or in any other appellate court in the country. And that was in the year 2004. May I ask a follow-up to that, too? Yes. What happened on remand? Was there an enforcement order issued by the district court in this case, the Oregon paralyzed victims case? Your Honor, on remand, Steumann moved for entry of summary judgment. Regal moved for a hearing on the equities, on the principle that the retroactivity and fair notice issue had not been decided, and the district court judge granted that hearing. At the conclusion of that motion argument, the case settled. So there was never an enforcement order that was issued? There was a consent order that was issued. Consent order. Right. The issues in that case, you're probably aware of the Hoyts case. Regal and Hoyts had a merger. There was a consent order that covered both of those movie theaters, and everything was sort of blended together once there was a recognition that the equities needed to be considered. Let me ask you a second question, because that's something that I did research on, and I believe you've told it as I understand it. The second question is, what is my standard of review? We're really talking, aren't we, about factual determination. The district court is supposed to hear all the facts that are in the record, listen to everybody, look at all the things that are in the record, and try to determine what the facts are. And then coming to me and determining what to do in this particular situation, don't I have an abusive discretion standard? Your Honor, yes. You have a sort of mixed standard here. You have an abusive discretion standard that applies to the issuance of injunctive relief, but in this case, both liability and remedies were decided on summary judgment motion. So superimposed on that, of course, is the idea that facts ought to be reviewed in the light most favorable to the nonmoving party, which in this case would be the AMC. So the standard of review is a little complex, depending on what it is that you're specifically considering. The court actually disposed of the fair notice issue in the district court below on the liability ruling. The court made a definitive ruling in January 2002 that retroactive AMC's arguments concerning retroactivity and the equities would not be entertained by the court. So you can't. Is that appealed here? Yes, Your Honor. I want to make sure I understood. The Department of Justice says that because AMC cooperated with the court in submitting a proposed order on remedies in accordance with the district court's prior decision, that somehow that's been waived. But it's not. I understand. I understand that argument. That's not what I was asking. Okay. Thank you very much. All right. The aggregate record of the Department of Justice's litigation against the movie indicates to put the best possible gloss on it, mass confusion. To say that there was an industry standard here is completely belied by what happened. As of 1999, there was not a single theater anywhere that the Department of Justice movies theater, anywhere the Department of Justice said complied with 4.33.3 in the stadium theater context. This is really important because Congress empowered the Department of Justice to issue detailed notice and comment rulemaking under Title III of the ADA. Now, the issue of whether they should have done that here isn't before this Court because that was decided in Stumann. And this panel is constrained by Stumann. But it still relates to whether or not there was fair notice. And the entire structure of the ADA standards, which were adopted in toto from ADAG, which is the access board standards, is one of very detailed objective criteria. The department was given 30 months by Congress to come up with these rules. And then Congress also said that the department had to give builders at least one year after that in order to sort of absorb the rules before they would actually go into place. Congress also directed that the department issue technical guidance to builders of places of public accommodation. And the department did that in a lot of ways, including on 4.33.3. But all of the guidance concerning 4.33.3 dealt with lines of sight in terms of obstruction. In fact, if you look at page 171 of the manual for ADAG, you'll see several pages and sketches that deal with obstruction to the screen. So we have a situation where the Stumann court said this regulation can conceivably and reasonably contain a component other than obstruction. But was that enough to just the fact that it could reasonably be read that way to provide notice to architects and construction people as to how to build the building? But don't you contend that the amicus brief in Lara was the earliest point at which notice was given? Exactly right, Your Honor. That's before the Stumann case. Right. That's 1998. 1998. The parties don't agree on a lot of things here, but one thing is absolutely clear. July 21, 1998 is the first notice that the Department of Justice gave to the movie theater industry concerning their belief that lines of sight comparable. And remember here, we're just talking about theaters smaller than 300. Because anything bigger than that, it's not really an issue because we've got dispersal. That lines of sight comparable includes a viewing angle component. The Department conceded that before. The theaters are larger than 300. How many of them? Percentage-wise. Your Honor, I do not know. I believe that just based on my personal experience, maybe 20 percent are larger. It's true that these days, this hasn't always been true, but since the advent of multiplexes, most of the theaters are smaller. You give people variety instead of having the large theaters. So the Department of Justice made it clear before the Sixth Circuit that this was the first notice, which is why AMC is asking you to use 1998 as the date for a reversal of the district court below on the issue of retroactivity. We do that even though there are plenty of arguments that the LARA amicus did not provide adequate notice. I mean, after all, it was just an amicus filed in private litigation in a court in El Paso, Texas. However, it is the first time that the Department spoke with clarity that there was a viewing angle component. And AMC had been desperately trying to figure out exactly what was required as time went on. The record is clear if you look at the evolution of the theaters, that even starting as early as 1996, which was just a year after the stadium-style theater was invented, that AMC was already adjusting how it was building these theaters. So if we use 1998 as the fair notice date, how many of your theaters are affected by the retrofitting under the district court's order? Your Honor, somewhere between 78 and 86. I'm not exactly certain because the architectural design are not in the electronic record of the court. And I didn't try the case below. But from what I could glean, the vast majority of the theaters that are being required to be retrofit here were actually designed prior to the LARA amicus brief, July 21, 1998. It looks like there are about eight theaters that it's not clear when they were designed versus they were opened. And there's a different timeline. Obviously in New York it takes longer to open a theater than it does in some other locations. There's no question, though, that AMC was actually at the forefront of trying to build stadium-style theater seats for people in wheelchairs that were acceptable to them. And when we look at the record, again, you have to really dig deep in it. You are really beginning to run out of time. You've got your yellow light. I'd like to discuss with you the nationwide nature of the injunction. I understand all of your arguments about hierarchy and comedy. But it's clear that courts routinely issue nationwide injunctions. If you were to comply fully with the injunction, put aside the fair notice, on a nationwide basis that was issued by Judge Cooper, would you be compelled to act in violation of Fifth Circuit law, or would you be acting consistently with Fifth Circuit law? Your Honor is correct that there's nothing in Judge Cooper's order that would require AMC to violate Fifth Circuit law. But what would happen is that AMC, unlike others within the Fifth Circuit, wouldn't be able to rely upon what is clearly authoritative precedent within the Fifth Circuit, and precedent that other theaters can rely upon. AMC doesn't get to take advantage of a less restrictive Fifth Circuit opinion doesn't mean that it isn't required when there's personal jurisdiction in the central district that it has to comply with that. You're not contesting that the district court here had personal jurisdiction. We do not contest personal jurisdiction, but we contest that the order violates the hierarchy of courts. The only court that can overrule a panel in the Fifth Circuit is an en banc Fifth Circuit decision or the Supreme Court. My point is that it's not overruling the Fifth Circuit, because it's not ordering you to do anything that would violate the Fifth Circuit or is contrary to the Fifth Circuit. It's, in fact, the Fifth Circuit just has, you'd actually be complying with both the Fifth Circuit and the Ninth Circuit, which has jurisdiction over you. That would be, that would be technically correct, but AMC would be required to, their theaters would be found in violation when other theaters under authoritative Fifth Circuit law are not in violation. What effect would that have on your competitive position as to the other theaters? It would be a horrible effect on the competitive position. It is extremely difficult to renovate theaters after they've already been constructed when we're talking about fundamental design issues. I'd also like to point out that the Department of Justice... Have you costed it out? No. Experience tells us that whatever you estimate concerning construction, you can multiply that by four times and you still won't be correct. Because we're talking about fundamental issues here of ramping and... Right, but you've just said if you were looking at post-'98 only, you've got really a relatively small number of theaters, and I'm just wondering how many are in the Fifth Circuit as opposed to the whole rest of the country. Your Honor, I believe that out of the 14 theaters in the Fifth Circuit, only three of them were open after the, or were designed after the Lara Amicus brief. We're talking about retrofitting three theaters, and the cost attendant to that, if we were to hold that 1998 was the fair notice date. Yes, Your Honor. In fact, you may not even be talking about that, because those theaters may have... We have 30-some theaters here that are all stadium design. Right, and I've been to some of them, actually. I prefer to sit in the handicap seats if no one's there, because they're good seats. They're good line-of-sight seats. So it can't be a horrific impact on your competitive ability if it's three or less theaters we're talking about. I think that's fair, Your Honor. If this Court were to decide that theaters designed prior to July 1998 were to reverse the district court below concerning theaters designed prior to July 1998, I think that would be a fair statement. All right. I'll give you some rebuttal time. Thank you, Your Honor. May I please report? My name is Gregory Friel. I represent the United States. I want to begin with the fair notice issue. We have made a waiver issue, but I want to address the merits of that issue first. That's wise. AMC knew what the term line-of-sight meant before it built the first stadium-style theater it ever built. In January 1995, that's four months before it opened the first stadium-style theater in the United States, AMC filed a brief referring to this regulation and said, and I'm quoting, lines of sight for a patron in auditoriums are measured with reference to the horizontal and vertical angles of view the eye must encompass in seeing the screen. Later on, after it was sued in this litigation, AMC took the position that it had always understood the term to mean unobstructed view, but that's a rewriting of history. But well before it opened its first theater, it knew what the term meant. Does it really matter what people out there were thinking if the DOJ itself was interpreting the statute or the regulation to be unobstructed? That's not, we did not interpret it to mean only unobstructed view. Obstruction is one component of line-of-sight. We have never taken a public position that there was also the component of the line-of-sight until 1998. And you still haven't, you promised the Supreme Court that you would change the regulation in opposing the grant of cert, and you issued a notice of rulemaking, and you still haven't clarified the regulation. Can you explain that? Yes. With regard to 1998, prior to CentiMark, one of AMC's competitors, filing an amicus brief in Texas, where it said line-of-sight meant only unobstructed view, the consistent statements by the theater industry itself was consistent with the department's interpretation. Both AMC, as I mentioned, in 1995, and the National Association of Theater Owners, repeatedly between 1991 up through 1995, repeatedly said line-of-sight encompasses viewing angles. But you're not responding to my concern, which is it doesn't matter what they're saying. What matters is what the Department of Justice, the enforcement agency, is saying to them. They can be, have all sorts of architectural design-related consumer satisfaction concerns, but unless the DOJ tells them this is what the reg means, it has to be the DOJ position, not their view. Well, Your Honor, by using the term line-of-sight, as this Court recognized in this Regal Sinemas case, that that term had been understood in the industry prior to 1991 as encompassing, among other things, viewing angles. But they used that to show why the DOJ's interpretation was not unreasonable and why deference should be given to it under Chevron. Yes, but when a term is used in a regulation that has a well-understood meaning within the industry to which that regulation is directed, this Court in other cases has recognized that the industry understanding of the term of art is highly relevant to whether the regulated business had fair notice. And in this case, the industry is saying one thing until we bring suit and then suddenly changes position and argues that it always meant unobstructed view. That's simply not how the industry understood it. Counselor, let me ask you a question, the same question that I asked counsel. It seems to me that this case comes to us on a motion for summary judgment. It does. And on a motion for summary judgment, we are to adopt the facts as alleged by the non-moving party and in a light most favorable to the non-moving party. Yes. And if we adopt the facts in a light most favorable to the non-moving party and then come out on summary judgment, then one can say the judgment would be. But if I take the facts most favorable to AMC, many of the facts you're now suggesting would not be in that line of facts. Your Honor, I would say that's the problem that I'm having with your argument, because on summary judgment, I have to take AMC's line of facts, not the ones you are suggesting, but those that they are suggesting. And if any contravention, I go with their facts, not your facts. Your Honor, the facts that I'm mentioning are undisputed as to whether those statements were made. AMC has not disputed that in January 1995, it said lines of sight are measured in terms of viewing angles. That particular fact is not disputed. But it isn't. It's also not disputed that the first time they knew that you had changed your view on how you were going to interpret it, they knew it was going to be interpreted the way you now want to interpret it, was in 1998. I disagree with that, Your Honor. The first time we addressed the issue, because it's the first time the movie theater industry had taken a view contrary to well-understanding, well-recognized understanding of that term, was 1998. If that's so, why did you on amicus, or why did you on appeal to the Supreme Court suggest that you would adopt some new rules by notice and comment? It seemed to me that in that particular situation you were saying, hey, what we've been doing in the past is wrong, we understand, we had an interpretation that was one, we'll put out notice and comment on rulemaking, which is the first time we've had a view contrary to well-recognized understanding of that term. And then we never even, we don't even have them yet. The government issued an advance notice of proposed rulemaking. The comment period is closed, and the comments were covered. Well, we don't have the rules. We don't, Your Honor, but the point I'm making is when a term has a well-recognized meaning within an industry, then the members of that industry have fair notice of what that term means. And we never said, I want to emphasize this, the Justice Department never said that it only, the term only pertained to obstruction. We did have some cases in which obstruction was the issue, primarily involving sports stadiums where people stood in front of others. But we never said it only meant obstruction. And, in fact, the industry itself had said it also includes viewing angles. So what's the whole point of fair notice? It's so that people who are, or businesses who are regulated know what the rules are. You can't have, we never said this. We weren't really quite clear on that. And then hold people to that standard to enforce. Your Honor, certainly industries are entitled to fair notice, and we contend that the undisputed evidence shows that they did have fair notice. Let's go beyond that just for a second. Is the reason that you haven't issued amended regulations is because it might undercut your litigation? position if you were to suddenly clarify the rules so that future movie theaters would know what the rule really meant? No, Your Honor. Let me explain. The line of sight issue is one component of a huge rulemaking that basically is involving a number of federal regulations. The access board's revised guidelines cover over 300 pages in the Code of Federal Regulations. The line of sight issue is a very small part. It's a complex issue affecting many people and has taken a long time. But let me go back to what AMC officials were saying in 1996, well before we issued the LARA brief. Douglas Siebert, the director for design and construction in the company's southern region, wrote a memo to high-level AMC officials in 1996 in which he said, we do not offer comparable lines of sight for wheelchair users in stadium-style theaters. All of our Florida projects need some accessible seating in the stadium area, and the accessible seating that we currently offer is quote, an insult to the disabled. This went to the AMC officials who were in charge of design and construction and in charge of accessibility issues. Okay. We know that. It's in your brief. It's in the record. We're well aware of that. AMC may very well have decided on its own, despite the fact it wasn't required to do so, to improve its seating for its handicapped customers. What does that have to do with whether the DOJ gave fair notice? The DOJ gave its notice by using the term line of sight, which had a meaning within the industry, Your Honor. And until 1998, there is no public statement of which I'm aware in which anyone in the industry said it meant anything else other than what it had traditionally meant as far as including both obstruction and viewing angle. May I take a question that Judge Smith has used quite effectively earlier this morning, which is the standard of review. We've had a finding here by the district court judge, as I read it, that the Department of Justice's interpretation of 433.3 to say that line of sight included the angle of vision was a reasonable one, and that persons in the industry before 1998 knew or should have known that that was the interpretation that would be used. And you've given an explanation as to why the Department of Justice filed this 1998 brief, because it answered to a contrary position. Now, if our standard of review is to determine whether the district court abused its discretion in making the finding of what an objective and reasonable theater owner would have known by reading 4.33.3, isn't that an argument for affirming? Yes, Your Honor. The standard of review as far as the balancing of the equities, and certainly fair notice is one among many equities subject to a highly deferential standard of review. And I urge the Court not to lose sight of the strong public interest in improving the viewing experience for persons with disabilities. That also is one of the equities to be balanced. And as we presented in the record, the AMC's placement of wheelchair spaces so close to the screen was not simply a minor annoyance to persons with disabilities. For many of them, it made the experience virtually unbearable. Some of them just gave up going to movies. So that also is a very strong factor that must be balanced as part of all the equities, which include fair notice. And I'm certainly not conceding that there was a lack of fair notice. I strongly assert that there was fair notice because the use of that term in the theater industry had been widely understood to mean viewing angle. And this Court, I cited a number of cases saying that when a regular, I think it's important, this isn't a regulation that is directed to the man or woman on the street. As a practical matter, it's going to be applied to people who are either architects, designers, or who have experience in the movie theater industry. And that's, I acknowledge that Joe Smith on the street, if you ask him what line of sight meant, may not understand this. But the industry itself is saying it includes viewing angles. And this, and I did cite a number of cases in which the industry understanding is highly relevant to the fair notice issue. And I can't remember the exact citation, but it's the Elias case, I believe the pronunciation in my brief, where this Court did refer to industry standards. And I ask the Court to look at the regulation there because I can't remember the exact wording. But I think a comparison of the regulation there in which the Court rejected a fair notice issue and the regulation here shows that, if anything, this is much clearer than the regulation in Elias. Kagan. Why did you bring a motion? Why did you do this on cross motions for summary judgment? It wasn't necessary to do it on cross motions for summary judgment. She issued summary judgment on the merits. Now we're looking at the remedy, and she could, it didn't have to be on summary judgment. In fact, it's unusual for it to have been on summary judgment. Your Honor, I think as far as the core facts, now the inferences that can be drawn, there may be disputes. It's a difference in the standards of review. I know, but I think the reason the parties did it through cross motions for summary judgment is the core facts were undisputed. The inferences that were drawn from those and how those weighed in the balancing of the equities, obviously we had diametrically opposed views. So that was really the issue of, given these facts, let the district judge draw the inferences and then balance the equities here, because the facts that I'm relying on about the 1996 and the 1995 brief, there's no dispute that those facts, to those particular facts. Now, the inference one can draw about whether that is a matter of law as fair notice, obviously we disagree. But I believe that's why it was appropriate for this case to go on a cross motion for summary judgment. Well, the problem that I had which I questioned you about is the standard review on the motion. Giving every deference to AMC about facts, maybe even, but I find a few disputed facts, even in the briefs about what you've done, but even giving all inference, and that's why I've questioned you about that, and finding a fact based upon all of that has been my worry. I want to change just a bit. This particular order goes to other circuits. Yes, it does. And as we get into Railway Labor Executives Association versus the ICC, we're not really looking at enforcement of a particular equitable remedy, but we're talking about comedy here. And our comedy about how we ought to do things in other circuits, and there the court said, courts do not require an agency of the United States to accept an adverse determination of the agency's statutory construction by any of the circuit courts of appeals as binding on the agency for all similar cases throughout the United States. It is standard practice for an agency to litigate the same issue in more than one circuit, and to seek to enforce the agency interpretation selectively on persons subject to the agency in those circuits where its interpretation has not been judicially repudiated. Now, it seems to me, then, if I read that case, us trying to enforce this in the Fifth Circuit, or any other circuit that has ruled on this, is a little bit out of where we ought to go on a comedy basis, even if I have the ability on an injunction basis to do so. I think we ought to do something with it, especially given that in Texas, the government okayed these constructions by state regulation. There was a rebuttable presumption down there. You had a chance to say, no, we're not going to do it that way. And the inspectors went ahead, applied their codes, misapplied them, misapplied them, did whatever they had to do, and now I'm going to come forth and say, no way. So, a couple points. With regard to the certification, as I mentioned in the brief, the Department has repeatedly stated that the certification goes to the standard in the code itself. It is not to be interpreted as any kind of endorsement of how the state code is enforced or applied. And so, the fact that some building officials in Texas did not properly enforce the state code, our question is, how did they do that, or even create a presumption? Second of all, and they didn't even know how to enforce it. If we look at everything that went through, given not until 1998, did we have an affirmative position that it had to be enforced one way rather than another? The rules said what they said, and maybe they could be broadly interpreted to be what you say they are. But that's the first time anybody said, that's what we're going to do. And we don't even have any rules out yet. But I'm just trying to lay out how the argument, as I heard it, and now how do I put it into the Fifth Circuit. Yes, and in the Fifth Circuit, I think the timing is very important here. The United States filed suit in the Central District of California in January 1999, made clear that it was a nationwide pattern of practice action, and we were seeking relief for theaters nationwide. And the Fifth Circuit ruled on this issue. That was the Lara District Court in Texas, which endorsed a position consistent with the United States. So when the suit was brought, and the District Court in the Central District obtained jurisdiction over AMC and its theaters, the Fifth Circuit hadn't even obtained jurisdiction over the Lara appeal. It hadn't even been docketed. There wasn't even an appeal there. And the decision didn't come down more than a year. I submit that under this Court's precedent, and Supreme Court precedent, if a court has personal jurisdiction, the presumption is that the court can issue a nationwide injunction. In light of the fact that there was no improper forum shopping here, there was no justifiable reliance. Isn't the key thing, the key issue really is whether we're doing anything to reverse. I mean, the whole point of this is, the whole notion of the hierarchical structure argument is that we'd be reversing the Fifth Circuit. But a nationwide injunction that was compatible with what the Fifth Circuit did, I don't see how that upsets the hierarchy. The Supreme Court doesn't have to. I mean, where you have AMC there. Now, at some point, it might be helpful if the Supreme Court would grant cert on this issue and sell it once and for all. But I don't see that there's a clear conflict here. There's not a clear conflict. AMC under this. I'm sorry? On the remedy. There is on the substance. Oh, you're right. On the remedy, AMC can comply with the injunction for its theaters within the Fifth Circuit and also comply with Fifth Circuit law. Clearly. And put itself at a competitive disadvantage, because the other theaters that are not under this injunction don't have to do anything. They don't have to do that. I mean, there is such a thing as economic disadvantage. I understand that, Your Honor. But I would point out that Regal Cinemas, which AMC has billed as one of its key competitors, does have to retrofit some theaters within the Fifth Circuit pursuant to a consent order. So there is going to be a large competitor that has to remedy those. But if there had been a direct conflict between where it would be impossible to comply with the injunction in the Central Circuit and the Central District and comply with Fifth Circuit law, we would have a much different case. And I would have a much harder case to argue before you. Do you have anything else to add, because you're over your time? Oh, I'm sorry. I do not. I ask the Court to affirm in its entirety, if there are no more questions. We'll give you another minute or so. I just wanted to make a quick couple of factual points. The fielder brief that the Council has repeatedly referred to as AMC taking a position concerning viewing angles actually involved an exception to 4.33.3 that dealt with where there are sight lines that required slopes in excess of 5%. So AMC was really talking about a different issue. Also, more to the point, their position wasn't accepted. So it's hard to see how that could be fair notice. The Florida quotation involved a Florida code that actually requires far more than the ADA requires. It specifically requires vertical dispersion. So that quote is also inapt. I'd like to refer the Court to footnote 10 of U.S. v. Cinemark before the Senate. This is the 6th Circuit where the Department of Justice actually conceded that their order should not be enforced within the 5th Circuit until such time as LARA was reversed, and also conceded that equities ought to be considered. And, Your Honor, one more point. The going forward perspective order here is also inequitable. Regal and Cinemark risers are defined in their orders at 4 inches, and AMC's risers are defined as a minimum of 12 to 18 inches. That is a huge economic difference, and the government, there's nothing in the record that justifies the government requiring so much more of AMC. Is that argument in your briefs? No, Your Honor. We made an argument about that and a lot of other things comparing these consent orders to the order that was issued by the judge here, taking the position that you needed to remand on those theaters post-designed, post-January 1998. Remand to the district court on that. Just let me ask you, just how big of a competitive disadvantage do you think you'd be in in the 5th Circuit, given that it's three or fewer theaters? Your Honor, I believe we're talking about three theaters here. I do not know how much that would cost. I will represent to the Court that AMC intends to build theaters within the 5th Circuit that comply with their current design, that they're using everywhere. So AMC absolutely intends to have the same level of wheelchair seating, comfort, and desirability within the 5th Circuit as everywhere else. So as in California. Exactly. So going forward, it's all going to be the same, so it's not really, and probably the other theaters pretty much as well too, because at this point. I do, however, think that an order that requires risers to be so much significantly higher for AMC than for other theaters is inequitable. Recalling that ramps can only rise one foot for about every 18 vertical, 18 horizontal feet for one vertical foot. So we're talking about a fairly significant difference when we talk about the number of ramps. The difference between a 4-inch riser and a 12- to 18-inch riser, and that is a difference that's contained in the going-forward order in the district court. However, these other risers that you're comparing to are all part of consent orders, and they weren't necessarily adopted by the district court. And so what you're trying to suggest is that a district court reviewing the facts with everybody saying, okay, we'll appeal a liability issue, and we'll fight about that on appeal, but we'll see if we can't work it out for a particular type of relief, and the district court then makes its decision on the relief, did not adopt the same standards that were in consent orders, does not necessarily mean the district court's order is incorrect, and what's my standard of review of that? I mean, it isn't that I have to say, oh, you had to meet all the consent orders that were entered in all the other cases. I there have a district court who is trying to do its best, using all the facts in front of it, and makes a decision, and now I have to decide that on the standard of review, which is upon substantial evidence, for all practical purposes, and there is. And so I worry about that argument, frankly. I think this approaches an issue of law. Can you read into 4.33.3 the difference between a 4-inch riser and a 12-inch riser? We're not so much complaining that different district courts approved a different consent order. We're saying the Department of Justice applied a different standard to a company without any record evidence as to why a different standard ought to be applied. But the Department of Justice didn't do it. The district court did, based on the evidence in front of it. For all practical purposes, the court applied a different standard that said, if the Department of Justice's position was reasonable at all Which they had defined as reasonable, since we'd said it was then the district court is going to defer to the Department of Justice's position. In fact, here, there was no evidentiary hearing, and the court just simply signed what the Department of Justice put before the court. All right, counsel. Thank you very much. Excellent argument on both sides. This court is in recess until 9.30 tomorrow morning. Thank you. All rise.
judges: Wardlaw, Bea, Smith